Filed 12/4/14  In re R.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E061573 |
| Plaintiff and Respondent, | (Super.Ct.No. J249090-92) |
| v. | OPINION |
| W.J., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lily L. Sinfield, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

Plaintiff and Respondent San Bernardino County Children and Family Services

1

(CFS) took minors A.C. (born in 2010) and twins R.C. and RaC. (born in 2012) (collectively minors) into protective custody on or about April 22, 2013, when officers arrested defendant and appellant W.J. (mother) for child abandonment and child endangerment. The juvenile court terminated mother's reunification services on January 21, 2014. On July 8, 2014, the juvenile court found minors adoptable and terminated mother's parental rights. On appeal, mother contends the court abused its discretion in declining to find the beneficial parent relationship exception to termination of parental rights applicable. We affirm.

FACTUAL AND PROCEDURAL HISTORY

On April 22, 2013, an officer was asked to conduct a welfare check of mother's home. He found four children, the oldest whom was five years old, alone. Minors were crying. The younger children were wearing urine soaked diapers. The home was filthy. There was no food in the refrigerator. A.C., the oldest, said the last time they had eaten was on the morning of the previous day. A relative informed the officer he found minors eating peanut butter out of a trash can the day before. A.C. said mother had left two hours earlier to buy diapers.

A.C. reported that father lived with them, though he was her stepfather.[1] A.C. said father had hit her with a plate once and used other methods of corporal punishment.

Mother was found and arrested for child abandonment and endangerment. The social worker was dispatched to the police station on an immediate response referral. She

---

[1] A.C. was released to her father on April 23, 2013.

spoke with mother at the police station. Mother said she had asked father to watch the children while she left, but he refused. She contended she was only gone for 30 minutes.

Father was contacted by phone, but he refused to come to the station to see minors or speak with the social worker.[2] Father reported mother had not asked him to watch minors and denied living with mother. Father was charged with child abandonment and endangerment the next day. The juvenile court formally detained minors on April 25, 2013.

Father later reported he had a no negative contact order as to mother due to past incidents of domestic violence. Mother reported she had been arrested for vandalism for an incident in which she broke father's car window. She denied any incidents of domestic violence. However, a criminal records review reflected mother had been arrested on July 5, 2009, for repeatedly ramming father's vehicle with another vehicle while father was still inside. The review also confirmed the no contact order with father.

Mother had been diagnosed with bipolar disorder and had been mentally hospitalized for 72 hours when she was 16 years of age. Mother was on probation at the time minors were taken into protective custody. Mother's probation from August 28, 2009, to July 25, 2013, derived from her conviction for assault with a deadly weapon. Her probation terms required that she drug test and attend NA meetings.

On May 15, 2013, CFS filed amended juvenile dependency petitions alleging mother had left minors alone (B-1), had failed to provide minors with provisions (B-2),

_____

[2] Father is not a party to this appeal.

3

had a history of domestic violence (B-5), had mental health problems (B-7), had a history of substance abuse (B-8), and was incarcerated for child abandonment and endangerment (G-10).  On June 27, 2013, the juvenile court found the allegations true, removed minors from parents' custody, ordered reunification services, and permitted visitation of two times weekly.

In a December 17, 2013, status review report, the social worker indicated, "Both parents have missed several visits with the children often times on a no call/no show basis."  With regard to the instant circumstances, mother had pled guilty to willful cruelty to a child likely to produce great bodily harm or death (Pen. Code, § 273A, subd. (a)).  Mother was arrested on September 4, 2013, for felony vandalism under circumstances involving an altercation between she, father, and father's girlfriend.  Mother had evidently thrown several rocks at father's girlfriend's car.

The social worker reported, "Prior to her incarceration, [mother] was not in compliance with her case plan services."  While mother had tested negatively for drugs on several occasions, she had failed to show for random drugs tests on three dates.  The social worker also noted, "Both parents have failed to consistently visit the children as well as participate in the court ordered services."  With respect to mother, the social worker observed "Mother had several no call/no shows prior to her incarceration; but did visit the children.  Currently mother does not visit due to being incarcerated."

At the six-month review hearing on January 21, 2014, the juvenile court found parents had failed to participate regularly and make substantive progress in the court-ordered treatment plan.  The court terminated reunification services, set the Welfare and

4

Institutions Code section 366.26[3] hearing, and ordered visitation for mother of one hour monthly once she was released from jail, with CFS authority to liberalize.

In the May 12, 2014, section 366.26 report, the social worker recommended terminating parental rights. Minors had been placed in the home of the maternal great-aunt and uncle on October 31, 2013. The social worker reported that minors "appear completely adjusted and in a normal environment and they appear loved, secure, and accepted by" the prospective adoptive parents. "[T]he children and the family have developed a mutual attachment." Mother had been visiting with minors and the social worker noted, "It appears appropriate and does not appear detrimental to the children to continue future visitation between the children and the biological mother."

Mother filed a section 388 petition on June 17, 2014, requesting reinstatement of reunification services. Mother noted that since January 21, 2014, she had attended seven domestic violence classes, completed a parenting class, had participated in seven classes at a neighborhood family center, and visited minors weekly.

On June 27, 2014, CFS filed a response in which it observed that during the period of reunification services, mother "made a conscious choice to not participate in her services. She never fully vested herself in her services and in her visitation with the children to reunify [with] them knowing full well the consequences of her actions or in this case, her inactions." The juvenile court had terminated reunification services due to mother's "non-compliance [with] the court's orders to participate in her services as well

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

as her visitation with the children." CFS observed mother "has visited with her children; yet these visits have not been on a regular basis and appear to be at [mother's] convenience."

CFS noted that minors are happy and "well-bonded to the family and the family well-bonded to the children. The children are thriving, comfortable, loved and secure in their placement. At this time, it would be detrimental for the undersigned to agree to the possibility of the children's lives being disrupted in the future if the mother were to make the necessary life changes to reunify with the children. It would not be in the children's best interest to upset their lives again to re-instate mother's services with no guarantee she will change her circumstances." On June 27, 2014, the juvenile court denied mother's request for an evidentiary hearing on her section 388 petition.

On July 2, 2014, mother's counsel requested a continuance of the section 366.26 hearing contending mother had just been released from the hospital. The juvenile court ordered mother bring in hospital paperwork to substantiate her hospitalization.[4]

On July 8, 2014, the court held the section 366.26 hearing. Mother testified that before CFS took minors into protective custody, minors had always lived with mother and mother had always taken care of their needs. She was initially granted two-hour, twice weekly visitation which she attended regularly, although she never progressed to unsupervised visitation. Mother had been incarcerated from September 4, 2013, to February 3, 2014; thus, she had been unable to visit with minors for five months.

---

[4] It does not appear in the record that the juvenile court ever subsequently asked for such paperwork or that mother turned in any.

However, since she was released, she visited with minors three to four times a week for three to four hours each visit. Sometimes she visited the entire day. During her visits, mother plays with minors, reads to them, makes snacks and meals for them, and essentially acts as their caretaker.

Minors call her "mommy." The twins cry when she leaves. A.C. asks mother when she will come home.

The social worker testified, "In preparation for the July 2nd hearing, I spoke with the caregiver July 1st just to confirm everything for the contested hearing. And she then informed me that [mother] had not been visiting other than for family functions. She would not initiate visits with the children. The children would only see her . . . a[t] birthday parties, etc. The visits have not – were not described to me as often and for the length of time from the care provider as the prior testimony had said." Mother had behaved appropriately during visits, "[t]he few she has attended." Minors appear "[v]ery comfortable. They have adjusted very well to the placement with the aunt."

The juvenile court noted, "In contrast to the description of mother's visits with the children, as compared to the description of the social worker about those visits, they are very, very different." "I think in this case if mother's description of those visitations are to be believed, she is much closer to that parental role in that she describes the cooking for the children and feeding them." The court found mother had maintained consistent visitation. Nevertheless, the court found the parent-child relationship between mother and minors was not such that severing it would be detrimental to minors and, regardless, was greatly outweighed by ensuring permanence for minors. Thus, the court found

7

minors adoptable and terminated mother's parental rights.

DISCUSSION

Mother contends the court's finding that the parental benefit exception did not apply is not supported by substantial evidence. We disagree.

Once reunification services have been terminated and a minor has been found adoptable, "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." A beneficial relationship is established if it "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534 quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent has the burden of proving termination would be detrimental to the child. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.)

"'[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

"[I]t is only in an extraordinary case that preservation of the parent's rights will

8

prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; accord *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights . . . . [Citation.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Although, the court found mother had maintained consistent contact with minors, presumably after her release from incarceration, mother had failed to maintain consistent visitation with minors beforehand. She missed five months of visitation with minors due to her incarceration. Moreover, even before her incarceration, social workers reported mother failed to visit with minors consistently. Furthermore, contrary to mother's testimony and the juvenile court's finding, the social worker reported mother's visitation with minors even after her release from incarceration was not consistent. Nevertheless, to the extent mother did maintain consistent visitation, substantial evidence supported the juvenile court's determination that minors' need for permanence outweighed any benefit their relationship with mother provided.

Mother failed to prove termination of her parental rights would be detrimental to minors. The twins had been out of mother's care for almost as long as they had been under her care prior to being taken into protective custody. In other words, they had lived approximately half their lives outside of mother's care. A.C. had been in mother's

9

custody for nearly three years when taken into custody, but had been outside mother's custody for a year and three months when mother's parental rights were terminated. Thus, substantial portions of minors' lives had been spent away from mother's care.

Minors were placed with relative prospective adoptive parents on October 31, 2013, eight months prior to the section 366.26 hearing. Minors and the prospective adoptive parents had developed a mutual attachment. Minors were thriving and secure in their current placement. As both the social worker and the court found, the minors' need for permanence outweighed any benefit which would be conferred by continuing their relationship with mother. Indeed, the social worker opined that any interference with minors' relationship with the prospective adoptive parents would be detrimental to minors. Thus, substantial evidence supported the juvenile court's finding that the beneficial parent relationship exception did not apply.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

RICHLI
J.

10